Good morning, Your Honors, and may it please the Court. My name is Kate Bushman, and I am pro bono counsel for Petitioner Adijan Haile Tekle. Mrs. Tekle is an ethnic Oromo and a citizen of Ethiopia. She petitions this Court for review of a Board of Immigration Appeals order denying her claims for asylum, withholding of removal, and relief under the Convention Against Torture on the basis of an adverse credibility finding. Her petition warrants review for two separate reasons. First, substantial evidence simply does not support the BIA's adverse credibility finding. Second, Mrs. Tekle's meritorious CAT claim was improperly analyzed under the wrong legal standard, that is, the legal standard that applies to asylum and past persecution, as opposed to withholding of removal underneath the Convention Against Torture. Turning to the adverse credibility determination, the BIA rested its decision on three purported inconsistencies, each of which cannot be supported by any reasonable reading of the record. First, any alleged inconsistency regarding the torture she endured are simply absent from the record. Contrary to the IJ's assertion, Mrs. Tekle never testified that she was beaten continuously throughout her two-week detention without charge for being a member, a suspected member of the OLF. I have to say, the way I read the record, the only way that statement was, the only time that statement was made was made by the government on the question. Yes, Your Honor. Indeed, when the IJ actually asked her, you know, were you beaten continuously, how often were you beaten, she clarified specifically, if I said continuously, again, conditionally, if I said continuously, I was just referring to the one time during which I was tortured for three hours or several hours. Further, she consistently testified regarding the questioning, the type of questioning she endured during her torture session. She said she was asked about her OLF membership, who her leader was, whether they had weapons, and the activities of her husband. And this in no way contradicts or is a discrepancy from her asylum application statement that she and other prisoners were questioned about the OLF's upper echelon. Furthermore, the finding regarding her father's treatment after her departure from Ethiopia similarly is a manufactured ambiguity. Mrs. Tekle said her father was threatened and taken into custody and questioned regarding her disappearance or, I guess, departure from the country while she was under government surveillance. Her brother then testified that he knew her father had been questioned, but did not know that he had never heard that his father had been arrested. Now, was this being translated or was this in English? It was translated for both Mrs. Tekle and her brother, Samuel. And there's a subtle difference between custody and arrest that even an American lawyer might occasionally blur. I believe an American lawyer would be very concerned about the precise definition of custody, especially when talking about government questioning. Okay. Finally, her decision to depart Ethiopia was – I'm sorry, that was adequately explained on any reading of the record. She said that the conditions in Ethiopia were deteriorating rapidly with regard to government relations with OLF members. She noticed people around her being arrested at an accelerated rate, and her brother had been accepted into diversity lottery. She began trying to make preparations to leave the country, which I think everyone knows it's a long and hard process to try to come to the United States. And she testified that, logically, after she had been detained for two weeks and tortured, that she then made the decision that she should stay in hiding and depart the country for good. Just turning quickly to the Kat claim. Before you do that, there are a couple of adverse credibility findings you have not addressed. One was that she claimed at the hearing that she joined the Liberation Front in 1999, five years ago, from the 2004 hearing. But it turned out that, in her asylum application, she said several years ago, but she produced herself an OLF letter that she'd been a member since 1993. The significance of that, to me, not only is it contradictory, but the significance is that she lived from 1993 to 1999 in Ethiopia as a member of OLF without any adverse consequences. Why isn't that, A, a contradiction, B, goes to the heart of the matter, C, she was given an opportunity to explain it, B, there's reasonable grounds for the explanation that it wasn't accepted? Well, I hope I can catch all your letters in my answer. But first, the BIA's decision did not embrace that inconsistency. So that's not on review before this Court. But in any event, that discrepancy was explained by Mrs. Tekle. She said she joined a social group that was affiliated with the OLF in 1993, something where she just gave some money, just, you know, involved, most likely because she is an ethnic Oromo, and so was involved very tertiarily. And then it's at the later date that she became a full-fledged member, was visiting other ethnic Oromos on a biweekly basis to distribute pro-OLF information, educate people about their civil liberties, which the EPDRF, the government in control currently of Ethiopia, and as well when she came to the United States, which they opposed and obviously did not appreciate. Do you want to discuss the difference between the Gregorian calendar and the Ethiopian calendar? That is to say, there's a problem in there. The IJ seems not to have understood that one of the dates was written in accordance with the Ethiopian calendar. Do you want to discuss that? Yes. That, Your Honor, you've just pointed out. Another discrepancy that was not embraced in the BIA's opinion, so again, is not on review before the Court, but there are indeed two separate calendars in use, one in Ethiopia and one here, and the dates absolutely line up with those two calendars. So it's not so much that she's making up a birth date, which I'm not sure would even enhance her claims, so this wouldn't even go to the heart of her asylum claim, but it explains the difference. But the IJ said something about, you said you were a member from such-and-such a period when in fact what I've got here in front of me shows it's a different period, and if you look at that with respect to reconciling the two calendars, is there an inconsistency or not? Your Honor, I can't speak to that. I don't know personally whether the Gregorian calendar would help line that up, but I do know that when specific, it would, okay, that I absolutely agree with the Court that it would help, it would line up a discrepancy. And again, she did, when asked consistently, when asked, you know, there's a discrepancy here, can you tell me what it was, she offered a cogent explanation here, I was only involved with this group, but then I accelerated my participation. So if the panel has no more questions on the adverse credibility finding, I'll just turn to the small difference in the, okay, I will. The Catt claim was analyzed improperly. The IJA absolutely, when he discussed the Catt claim, did not speak in any terms in relation to the regulations implementing the Convention Against Torture, did not discuss any of the documentary evidence, and indeed talked about whether she had established past persecution, which he held that she hadn't, even if her testimony that she was beaten around the soles of the feet for three hours, even if that was true, she had been subjected to felaca, a recognized form of torture, that that was not persecution. So I submit that that in and of itself is sufficient for a remand, since this is a legal error. If he didn't find she was persecuted, how could he find she was tortured? Isn't torture some sort of worse persecution than persecution? Yes. I would probably say that if he had actually, if Judge Gasly had actually analyzed this, I assume that he would have said she wasn't tortured either. And if that were the case, I would be standing here before you saying that's a legal error in itself. But the conclusion is that the substantial evidence was compelled to find that she was tortured, and he didn't consider that. Exactly. Why don't we save you a little bit of time, we'll hear from the government, and then you've got a chance to respond. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Andrew Nsinga for the Respondent, the Attorney General. Before the Court today is the Board's decision in which there are three inconsistencies. One, Petitioner's timing and reason for leaving Ethiopia. Two, the frequency and scope of the interrogation. And three, whether or not the father was actually arrested. Under the substantial evidence standard, this Court may not substitute its opinion for the agency's. It must find that the record compels the conclusion that she was a credible witness. It may not supplant the Board's finding merely by a claim that there are other possible findings that would have been supported by substantial evidence. With regards to the timing and reason for Ethiopia, she said in her asylum statement she came here after the interrogation. However, after on recross, when the government's asking her questions regarding this decision, she says, yes, I have plans to escape the country before my arrest, which is clearly supported by the fact that. And how does that make her story about having been tortured incredible? It demonstrates that she made a decision to come here beforehand. Now, if I'm a Jew in Nazi Germany in 1938 and I smell trouble and I start preparing, but before I can fully get all my papers in order, the Nazis capture me and mistreat me, and by some miracle I get away and then I leave, does the fact that I made preparations worrying about what might happen to me before I was actually captured mean that my capture story is not true? It states that you misstated something in your application. What did she misstate? She states that she chose to leave after the interrogation, however, then admitted that she chose to leave before interrogation, which can't possibly have been a mistake because she did choose to leave. She might have been making preparations to leave beforehand, but that can't be just a misuse of words if she's to say that was a mistake, that she said she chose to leave. Well, of course she chose to leave after. That's exactly what she did. But the reality is that the evidence shows that she chose, substantial evidence shows that contrary to her statement in the asylum application, that she chose to leave beforehand, which is supported by the fact that her visa, which, as counsel She certainly did not leave detention and go to the American consulate. No, okay. I think I understand your point. I have to say that making preparations ahead of time doesn't mean, to me at least, that her story about what happened to her is false. Well, that is the government's position, Your Honor. And I think additionally, the fact that she went to get her birth certificate and admitted to getting her birth certificate in July of 2006, months before anything happened. That's part of the preparation. That's for sure. Right. Additionally, excuse me, regarding the frequency of the alleged beatings, her counsel said to her, how many times did they beat you? I cannot quantify in hours, but they were just continuously beating me. That's her own words. They were continuously beating me. Do you want to read the entire context in which that's said? What page are we on in the AR? This is 125, Your Honor. They're discussing her interrogation. This is 125 of AR pagination? Yes, Your Honor. Okay. Okay, so where are you reading from? I believe it is towards the top of the page, Your Honor. Line 7. Okay. Her counsel says, okay, how many times did they beat you? Yeah. Yeah. Her response is continuously. Well, but she says, I can't quantify it in hours, but they were continuously beating me, which says to me, well, during that period, which lasted for several hours, they were continuously beating me. Well, I think, again, I think this is directly what this Court has said about credibility fines. Is that possible? Is that a possible explanation that could be supported by substantial evidence? Possibly. Possibly. However, the Board found that that is an inconsistent statement, and the evidence does not compel a contrary conclusion. That's a possible explanation and possible. Continuously to mean without interruption. Without interruption, because he says how many times did they beat you. You read it to mean without interruption over a space of two weeks? Well, this is how, obviously, the agency read it. Well, don't be silly. And what was the discrepancy? You know, Judge Gasly found there was a discrepancy between this and what her brother said. Do you remember what her brother said? That she had been treated badly. Severely beaten. Right. Now, what's the discrepancy between being severely beaten and saying I was beaten for two weeks? Well, I think there are two points in this. First of all. What's that? There are two points, Your Honor. First of all, this Court is not reviewing the immigration judge's decision. The Board did not adopt and affirm the decision of the immigration judge. The Board gave three reasons it was finding her inconsistent. And it's only affirming the decision, but it did not in any way at any point in its decision adopt or cite to. And why does the Board find her incredible? Because the Board agrees with those three particular findings, the ones that I ---- Well, and the Board is picking up the findings of the IJ, isn't it? Yes, Your Honor. But it does not adopt the decision of the immigration judge. So its decision is limited to those three decisions. And what specifically does the Board find was incredible? The fact that she claims in direct response to her own counsel's questions, how many times did he beat you, how many times did they beat you, and she says continuously. And the Board pundits pat on that. That's incredible to me. On all three reasons, Your Honor. On all three reasons. So just in terms of ordinary exchange and language, when somebody says how many times did he beat you, and she's testifying, well, it was only on one occasion, but she says I can't tell it to you in hours, but they were just continuously beating me, that says to me they were continuously beating me during the hours of this episode. And if she had meant to say they were continuously beating me over two weeks, I don't think she would have said I can't tell you in hours. Your Honor, there is not that discussion about there being one occasion. That came on government cross. Well, that's when the government says, now this is the government's question, on direct examination, you said this occurred continuously during the time you were detained for two weeks. And she responds, I said on one occasion and it happened for several hours. That's not what she said, Your Honor. The record on 125, that is not what she said. But that's what she says on 158. Which is contradictory to what she said on direct. Well, you see, I have to say what she says on direct I understand in precisely the same way that she responds on page 158 on cross. Well, with all due respect, Your Honor, the question is how many times did they beat you, not how many times on this one occasion did they beat you, how many times on Thursday did they beat you, how many times did they beat you? That question clearly refers to the entire state. I understand your position. Okay. That's a judge's way of saying I disagree. I understand, Your Honor. Thank you. And obviously, that is the government's position. And again, the record must compel the conclusion. And not on all three of these findings as well. The Board also noted that the scope of interrogation changed. In her initial asylum application, she said that it was primarily about the knowledge and upper context within the OLF. And then on cross, she said other than one question about the leader, mostly about her husband. That has never been answered. The only response to that is, well, there is the immigration judge's focus had changed at court. What the petitioner changed is the focus of the interrogation. Finally, regarding the father being arrested, on direct, the petitioner said he was interrogated. There's no mention of this, by the way, in her asylum application. The immigration judge asked her questions, and she says, no, he was put in custody. Then the brother, who, by the way, there is absolutely no evidence the brother testified through the interpreter. In fact, the brother prepared her asylum application in English. There's absolutely no evidence to suggest her brother was testifying in Amharic. The brother says the family was threatened, and then he says specifically, I'm not aware that no one was arrested. And then he says, but I know my father was questioned. Now, petitioner attempts to claim that, well, that's acceptable. Well, he wasn't aware of the arrest. But the problem is he was clearly aware of what was occurring with his family. He clearly spoke to his family, and he was aware of what was going on, and he knew his father's question, but had no idea that he had been arrested. Now, to get into the nuances of language regarding custody and arrest, there's no evidence to suggest that the brother was testifying in Amharic, and he said that no one was arrested. Let me say something. I'm not responding to you in a way. I'm responding to the I.J. Let me say to you something that the I.J. said at the beginning of the proceedings. I'm just reading from him. I'm starting on 114 of the A.R. I.J. says, I have one other comment. And again, I don't care if the Ninth Circuit wants to report this to my supervisor. The Ninth Circuit does not comply with Supreme Court law with regard to asylum. While I'm in the Ninth Circuit and have to comply, I do note that they don't really care what immigration judges do. If an immigration judge makes an adverse credibility determination, they will, in only one case out of every 250 to 300, affirm it. So I don't play their game with regard to credibility determinations. In my view, an asylum merits hearing is analyzed on the basis of whether the claim itself is credible as opposed to testimony, because that's really the strength of it, because it's very rare that an immigration can make and have withstand either with the Board or with the Ninth Circuit under applicable Ninth Circuit law an adverse credibility determination. Now, again, this is not directed to you. It's directed to the I.J. I can't tell you how many cases I have affirmed adverse credibility determinations by I.J.s. By far the majority of cases that come before me in which an adverse credibility determination is made, we affirm, and we usually affirm them by summary disposition because it is so obvious that the I.J. is correct. It is a rare case where we, in fact, reverse the adverse credibility determination. And I think this I.J. probably knows that. I don't know for sure what he knows. What I know he says is, we sustain an adverse credibility determination one time out of 250 or 300. That is false. I would simply suggest that. First of all, it didn't affect the hearing in this case. The Petitioner has absolutely never suggested any of this regarding in this case, so therefore it's been waived on exhausted. And while I understand that, I think that the immigration judge can have it. I'm not making any due – I'm not making a due process argument. I understand, Your Honor. I'm not making a bias argument. I am merely responding to something that is in the record in this case, and I wish to correct the record.  I understand. I suggest perhaps, and obviously I cannot speak to the immigration judge, he perhaps may have been speaking in hyperbole and nothing specifically. Obviously, he does not quote any specific law. Okay. Mr. Insania, I'd like to ask you what I asked the government counsel before. How long have you been handling these cases? A year and a half for the government, and previously I worked during law school. I'm sorry. You said that so fast. I'm sorry. A year and a half for the government, and then previously I worked on representing aliens during law school. In law school, you represented what? Aliens. Oh, yeah. I see. Primarily. That was your introduction and representation. Yes, Your Honor. Well, you know, this is just advice. It's friendly advice that I hope would get to you and possibly to others. It's too bad if the Justice Department feels I have to send up lawyers as loyal foot soldiers to defend mistaken decisions. It's not a disaster if once in a while you say, gosh, we made a mistake. The IJ made a mistake. The BIA made a mistake. You're going to have to march up here and defend every decision, and I would hope you have some ability within your bureaucratic system to say to your supervisor, why are we doing this? Let's just concede error and get back. If you read this record, it's awful. Judge Gastly is a disaster. I don't know where he comes from or what his views are, but he struck me as a judge who went out of his way to make trouble for the Petitioner. He's very close to being a disgrace. And to have a fine young lawyer like you come up and defend what is essentially his decision because the board picks it up, that's too bad. But you did the best you could. Thank you, Your Honor. I would conclude that substantial evidence does support the immigration judge's decision and the board's decision. Excuse me, the board's decision, and this Court should deny the petition for review. Thank you. Response? I realize that I was almost out of time, so I'll be very brief. Ms. Teckley does not ask this Court to supplant the board's authority. In fact, Ms. Teckley just asked that you apply the standard, which is that any reasonable factfinder would be compelled on this record to fine in her favor. Now, I have one question for you, which is, assume just as a possibility that we reverse the adverse credibility determination here. Okay. Do we have to remand under Ventura, that is to say, directing the BIA to take the testimony as true and then decide whether or not it rises to the level of persecution? Yes, Your Honor. I kind of think we do. And in sum, for all these reasons, we request that the petition be granted and remanded for the favorable exercise of discretion. Thank you. And you are also doing this case pro bono? Yes. Well, the Court thanks you and the government thanks you. Thank you. The case of Teckley v. Mukasey is now submitted for decision. And I'm sorry that you've had to wait so long, but we are finally here. Thank you.
judges: Noonan, W. Fletcher, Bea